IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA

v.                                                          No.

JEFFREY PAUL MADISON (01)
MARK CHRISTOPHER BOGGESS (02)
BIBY ANCY KURIAN (03)
ABRAHAM PHILLIPS (04)
DAVID MICHAEL LIZCANO (05)
LAURA ORTIZ (06)
KEITH ALLEN WICHINSKI (07)
JUAN DAVID ROJAS (08)
DR. JOSE ROEL MALDONADO (09)
DR. EDUARDO CARLOS CANOVA (10)

> U.S. DISTRICT COURT
> NORTHERN DISTRICT OF TEXAS
> FILED
>
> FEB - 9 2022
>
> CLERK, U.S. DISTRICT COURT
> By _____
>           Deputy

**4-22CR-034-0**

## INDICTMENT

The Grand Jury Charges:

At all times relevant to this Indictment:

### Introduction

1.      The defendants, **Jeffrey Paul Madison**, **Mark Christopher Boggess**, **Biby Ancy Kurian**, **Abraham Phillips**, **David Michael Lizcano**, **Laura Ortiz**, **Keith Allen Wichinski**, **Juan David Rojas**, **Dr. Jose Roel Maldonado,** and **Dr. Eduardo Carlos Canova** engaged in a complex scheme that funneled illegal kickbacks to medical providers in exchange for the referral of prescribed tests (i.e. blood and toxicology) to laboratories controlled by certain defendants.

2.      These kickbacks were disguised in a variety of ways, including, but not limited to fraudulent lease payments, salary offsets, payments to third-parties, commissions, fraudulent medical advisor agreements, and ownership interests in certain

Indictment – Page 1

laboratories.  As a result of these kickbacks, laboratories controlled by certain defendants were able to submit more than $300 million in billing to federal government healthcare programs.

### Defendants and Related Entities

3.     Unified Laboratory Services, LLC ("Unified") was a clinical medical laboratory company that performed diagnostic testing including blood, toxicology, respiratory, and genetic testing.  Unified submitted claims for reimbursement for its work to a variety of insurance entities, including federal healthcare programs, such as Medicare, Tricare, and the Railroad Retirement Board.  Unified was located in Fort Worth, Texas, and was founded in May 2012 by defendant **Jeffrey Paul Madison**.

4.     **Madison** possessed little to no experience in the laboratory field or healthcare industry prior to the creation of Unified.

5.     **Madison** also founded Spectrum Diagnostic Laboratory, LLC ("Spectrum"), in March 2014, in Arlington, Texas.  Spectrum performed the same services as Unified but at a different location.  In practice, Unified performed the initial "presumptive" test on a specimen, and Spectrum performed the second "confirmatory" test on a specimen. Spectrum also submitted claims for reimbursement for its work to Medicare.

6.     Unified and Spectrum shared employees, payroll, finances, owners, and management. Unified and Spectrum acted as the same entity, however under different names and addresses.

7. Defendant **Mark Christopher Boggess** was the Chief Operations Officer at Spectrum and Unified. **Boggess's** responsibilities included arranging payments for marketers and payments to medical providers.

8. Reliable Labs, LLC ("Reliable") was a clinical medical laboratory company that offered toxicology testing. Reliable was located in Carrolton, Texas, and was founded in July 2014 by defendants **Biby Ancy Kurian** and **Abraham Phillips**. Reliable began operating as a business in early 2015.

9. **Kurian** had prior experience managing laboratories and was responsible for the day-to-day lab operations at Reliable. **Phillips** was responsible for finding new customers and marketing at Reliable.

10. In September and October 2015, **Madison** approached **Kurian** and **Phillips** through a third-party to discuss a potential partnership. **Madison** proposed that Reliable be converted to a physician-owned laboratory and thereafter only handle testing that would be reimbursed by private insurance companies, as opposed to government programs, such as Medicare. **Kurian** and **Phillips** eventually agreed and **Madison** and **Boggess** received an ownership interest in Reliable through an entity that they created.

11. Defendant **David Michael Lizcano** owned and operated David-Claudia-Lauren Holdings, LLC, ("DCLH") located in San Antonio, Texas. DCLH was a marketing firm for various laboratories, including Unified, Spectrum, and Reliable.

12. Defendant **Laura Ortiz** was the sister of **Lizcano** and worked for **Lizcano** at DCLH.

13.     Defendant **Juan David Rojas** was a marketer.  He operated a business, known as Rojas & Associates, LLC.

14.     As marketers, **Lizcano**, **Ortiz,** and **Rojas** attempted to identify and convince medical providers to order tests and send those orders to the labs that they worked for, such as Unified, Spectrum, and Reliable.

15.     **Madison** and **Boggess** created and utilized a variety of entities to make payments to marketers.  These entities included: MBK Consortium and MBK Labs – Carrolton 1 LLC.

16.     Defendant **Keith Allen Wichinski** was a board-certified Nurse Practitioner, who was based in San Antonio but worked in a variety of locations throughout Texas.  As a Nurse Practitioner, **Wichinski** often ordered certain tests to be performed for his patients. For example, **Wichinski** submitted over 4,000 orders to Unified and Spectrum between October 2015 and February 2018.  These orders resulted in billings by Unified and Spectrum in excess of $21 million, including over $14 million to federal health care programs.

17.     Defendant **Dr. Jose Roel Maldonado** was a family medicine doctor, who was based in Laredo, Texas.  **Dr. Maldonado** submitted orders that resulted in billings by Unified and Spectrum in excess of $4 million to federal health care programs.  **Dr. Maldonado** received over $400,000 in kickbacks.

18.     Defendant **Dr. Eduardo Carlos Canova** was an internal medicine specialist, who was based in Laredo, Texas. **Dr. Canova** submitted orders that resulted in billings by Unified and Spectrum in excess of $12 million to federal health care programs. **Dr. Canova** received over $300,000 in kickbacks.

### Federal Insurance Program

19.     The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost healthcare benefits to certain individuals, primarily the elderly, blind, and disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by physicians, nurses, and other healthcare providers, including laboratories, such as office visits and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

20.     For a laboratory to become enrolled in Medicare, it must submit a Medicare enrollment application. CMS regulates all laboratory testing through the Clinical Laboratory Improvement Amendments ("CLIA") regulations, which establish standards for laboratory testing covered and paid for by Medicare. Once they have received CLIA accreditation, they may apply to Medicare to be a health care provider to receive payment for health care services provided.

In submitting an application to Medicare, health care providers certify they understand and will abide by the federal laws and regulations governing their participation in Medicare, including a specific understanding of 42 U.S.C. § 1320a-7b(b), also known as the Anti-Kickback Statute.

21.     The Tricare program ("Tricare") was a health care program of the United States Department of Defense ("DOD") Military Health System that provided coverage for DOD beneficiaries world-wide, including active-duty service members, National Guard and Reserve members, retirees, their families, and survivors.

22.     The United States Railroad Retirement Board (RRB) administers comprehensive retirement-survivor and unemployment-sickness benefit programs for railroad workers and their families under the Railroad Retirement and Railroad Unemployment Insurance Acts.

23.     Medicare, Tricare, and RRB were each a "health care benefit program," as defined in Title 18 United States Code, Section 24(b) and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

24.     Physicians, nurse practitioners, and other healthcare providers, including laboratories, could file a claim for reimbursement for Medicare, Tricare, or the RRB, where appropriate.

### Anti-Kickback Law

25.     The Anti-Kickback Statute, Title 42, United States Code, Section 1320a-7b(b), prohibited any person or entity from making or accepting payment, in cash or in kind, to induce or reward any person for referring, recommending or arranging for

federally-funded medical services. For example, and in the simplest sense, the statute prohibited a laboratory from paying a doctor cash in exchange of the referral of a large volume of tests.

26. The purpose of the Anti-Kickback Statute was to ensure that referral decisions are made solely with the goal of a patient's well-being. Referring patients based on the expectation of personal profit corrupts the health care system because it encourages medical providers and others to make referral decisions for reasons relating to personal profit rather than a patient's best interests. The payment of kickbacks also corrupts the health care system because kickbacks have the effect of generating business for the dishonest provider at the expense of the honest provider who refuses to pay kickbacks.

27. Under the Anti-Kickback statute, certain activities are covered by the Safe Harbor Provisions, set forth in 42 CFR § 1001.952 – meaning such activities will not be deemed illegal remunerations under the Anti-Kickback Statute.

28. These safe harbors include "space rentals." To qualify under the safe harbor, however, a property lease must, among other things, be set in writing, must be for a specific and appropriately sized location, may not be for less than one year, must be consistent with fair market value and negotiated in an arms-length transaction, and cannot take into account "the volume or value of referrals that may be made in whole or part under a federal health care program."

29. The safe harbor provisions also include certain "personal service and management contracts." To qualify, however, the contract for the services or management must be for "not less than one year," must be "set in advance," must be "consistent with

fair market value in arms-length transactions," and cannot be "determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties."

30.    In October 1994, the HHS Office of Inspector General ("OIG") issued a Special Fraud Alert on Arrangements for the Provision of Clinical Laboratory Services. In the Special Fraud Alert, the OIG posed the question, "How does the Anti-Kickback Statute relate to arrangements for the provisions of clinical lab services?" The OIG's answer, in part, was the following:

> Whenever a laboratory offers or gives to a source of referrals anything of value not paid for at fair market value, the inference may be made that the thing of value is offered to induce the referral of business. The same is true whenever a referral source solicits or receives anything of value from a laboratory.

31.    On June 25, 2014, the OIG issued a Special Fraud Alert on Laboratory Payments to Referring Physicians. The Alert stated that:

> Arrangements in which laboratories provide free or below-market goods or services to physicians or make payments to physicians that are not commercially reasonable in the absence of Federal health care program referrals potentially raise four major concerns typically associated with kickbacks—corruption of medical judgment, overutilization, increased costs to the Federal health care programs and beneficiaries, and unfair competition. This is because such transfers of value may induce physicians to order tests from a laboratory that provides them with remuneration, rather than the laboratory that provides the best, most clinically appropriate service. Such transfers of value also may induce physicians to order more laboratory tests than are medically necessary, particularly when the transfers of value are tied to, or take into account, the volume or value of business generated by the physician. We are particularly concerned about these types of arrangements because the choice of laboratory, as well as the decision to order laboratory tests, typically is made or strongly influenced by the physician, with little or no input from patients.

Count One
Conspiracy to Pay and Receive Health Care Kickbacks
(Violation of 18 U.S.C. § 371)

32.     The allegations contained in paragraphs 1 to 31 of this Indictment are reolleged and incorporated by reference as though fully set forth herein.

33.     Beginning in or around 2015 and continuing through in or around 2018 in the Fort Worth Division of the Northern District of Texas and elsewhere, the defendants **Jeffrey Paul Madison**, **Mark Christopher Boggess**, **Biby Ancy Kurian**, **Abraham Phillips**, **David Michael Lizcano**, **Laura Ortiz**, **Keith Allen Wichinski, Juan David Rojas, Dr. Jose Roel Maldonado,** and **Dr. Eduardo Carlos Canova** did knowingly and willfully conspire and agreed among themselves, and with other persons both known and unknown to the Grand Jury, to commit and abet certain offenses against the United States, including:

a.     to violate the Anti-Kickback statute by knowingly and willfully soliciting or receiving any remuneration, including any kickback, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring any individual for the furnishing or arranging for the furnishing of any item or service or in return for ordering or recommending the ordering of any item or service for which payment may be made in whole or in part under a Federal health care program, in violation of 42 U.S.C. §§ 1320a-7b(b)(1)(A) and 1320a-7b(b)(1)(B); and

b.     to violate the Anti-Kickback statute by knowingly and willfully offering or paying remuneration, including any kickback, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce the referral of any individual for the furnishing of

any items or service or to induce another person to order or arrange for or recommend the ordering of any item or service for which payment may be made in whole or in part under a Federal health care program, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A) and 1320a-7b(b)(2)(B).

### Object of the Conspiracy

34.     The object of the conspiracy was for the defendants and others to unlawfully enrich themselves and others through a kickback scheme.

35.     More specifically, defendants **Madison** and **Boggess** sought to obtain a larger number of testing referrals for Unified and Spectrum in exchange for the kickbacks and bribes that they directed and authorized. These tests were submitted for reimbursement from Medicare, Tricare, and RRB and the payments from these health care programs flowed through to the defendants as owners and employees of these labs.

36.     More specifically, defendants **Kurian**, **Phillips, Madison,** and **Boggess** sought to enrich themselves through Reliable. As they knew, Reliable's success was dependent upon the success of Unified and Spectrum and the kickback scheme.

37.     More specifically, defendants **Lizcano**, **Ortiz,** and **Rojas** solicited, paid, and received payments from other conspirators for their role in identifying, obtaining, and maintaining relationships with medical providers who would provide referrals in exchange for kickbacks. **Lizcano**, **Ortiz,** and **Rojas** received a percentage of the amount of insurance reimbursements received by Unified, Spectrum, and Reliable, in violation of law.

38.    More specifically, defendants **Wichinski, Maldonado,** and **Canova** received kickbacks from other conspirators, including **Lizcano**, **Ortiz**, and **Rojas** at the direction of **Madison**, **Kurian**, and **Phillips**, and executed by **Boggess**, in exchange for their referral of urine samples to Unified, Spectrum, and Reliable.

### Manner and Means of the Conspiracy

39.    The manner and means by which the defendants sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

a.    Medical providers, such as **Wichinski, Maldonado,** and **Canova** saw patients who sought medical care.  During the medical appointments, these medical providers performed medical examinations and determined whether additional services, including diagnostic testing should be ordered.

b.    Once a test was ordered, an individual who worked inside the medical provider's office but who was typically paid by Unified and Spectrum, collected the specimen (i.e. toxicology) from the patient and sent the specimen to a testing lab, such as Unified and Reliable.  These individuals were known as "collectors."

c.    Once the specimen was received, the lab (such as Unified and Reliable) conducted the prescribed diagnostic test.  This was known as the "screening" or "presumptive" test.  If ordered by the medical provider, the lab would then the send the specimen to another lab, such as Spectrum, for a secondary test, known as the "confirmation" test.

d.      After performing the tests, the labs (Unified, Spectrum, and Reliable) billed the insurance entities (including Medicare, Tricare, RRB) and sought reimbursement. These reimbursements were the primary source of income for Unified, Spectrum, and Reliable.  Thus, the number of tests each of these performed directly correlated to their profits.

e.      In an effort to maximize their profits, **Madison, Boggess, Kurian,** and **Phillips** sought to financially incentivize medical providers to send additional tests to Unified, Spectrum, and Reliable by providing them with illegal financial incentives that were disguised to appear as legitimate business transactions.

### *Lease Payments*

f.      The illegal financial incentives included lease payments.    **Madison** authorized payments to medical providers that appeared to represent a lease payment for a portion of the medical provider's office.

g.      Unified performed an evaluation of a medical provider before offering a lease payment by examining their referral history.  Unified determined whether it would be profitable to pay a particular medical provider a lease payment.  Medical providers were told that only those who referred a minimum number of laboratory tests per month to Unified would be considered for a lease agreement.

h.      These conspirators, along with the medical providers who accepted the payments, such as **Wichinski, Maldonado,** and **Canova**, and the marketers, such as **Lizcano**, **Ortiz**, and **Rojas** made it appear as though Unified and Spectrum were leasing space in the medical provider's office so that their collectors could perform collection

Indictment – Page 12

activities. The lease payments, however, were not based on legitimate rentals of space. Instead, they were based on arbitrary information, made retroactive to a date when a medical provider provided their first referral, lasted less than 12 months, and were directly tied to the volume of referrals. **Boggess** processed and facilitated the payments, knowing that they were not based on actual leases. In exchange, medical providers increased the number of referrals that they sent to Unified and Spectrum, including those reimbursed by Medicare, Tricare, and RRB.

### *Salary Offsets*

i.      The illegal financial incentives also included salary offsets. **Madison** authorized payments to medical providers, for employees of the medical providers who also acted as collectors for Unified and Spectrum. The amount of salary offset was not commensurate with the amount of time these employees spent on "collecting." In fact, on certain occasions, a full-time collector was already working in the same facility and performing other duties. Collectors were also told that their compensation was based on the volume of referrals.

### *Payments to Third Parties*

j.      These illegal financial incentives included payments to third parties. **Lizcano** and **Ortiz** made "marketing payments" to the spouse of a medical provider, even though that spouse performed no medical services to justify such payments. Instead, the payments were simply a way to incentivize the medical provider to continue to submit a high volume of referrals to Unified and Spectrum.

k.      **Madison**, **Boggess**, **Lizcano**, **Ortiz**, and **Rojas** kept detailed records regarding the referral numbers of each medical provider so that they could properly calculate kickbacks.

### *Medical Advisor Agreements*

l.      Marketers, such as **Rojas**, offered certain high-volume doctors, such as **Maldonado** and **Canova**, the opportunity to enter into a medical advisor agreement, in which the doctor would be paid for advisory services. In reality, the doctors performed no services, were not paid on an hourly rate, and these agreements were used as a way to funnel kickbacks to the doctors.

### *Upcoding*

m.      In addition to increasing referral volume, medical providers also ordered more extensive testing, as opposed to targeted and narrow testing. Such tests were more expensive for insurance programs and generated greater profits for Unified and Spectrum. This process is known as "upcoding."

### *Payments to Marketers - Commissions*

n.      Marketers, such as **Lizcano**, **Ortiz**, and **Rojas**, were paid based on a percentage of referrals that they brought to Unified and Spectrum, in violation of law. These included referrals that were reimbursed under Medicare, Tricare, and RRB. **Boggess**, at the direction of **Madison** worked with marketers to create fake invoices to make it appear as though they were being paid on an hourly basis when, in fact, they were being paid based on volume referral. Following the completion of the invoices, **Boggess** facilitated payments to the marketers.

### *Ownership in Laboratory - Reliable*

o.      In the fall of 2015, **Madison** approached **Kurian** and **Phillips** and suggested that they convert Reliable into a physician-owned lab ("POL"). As all four knew, a lab that processed and sought reimbursement from federal healthcare programs (i.e. Medicare, Tricare, and RRB), like Unified and Spectrum, could not operate as a POL. But **Madison** also knew that physicians could be compensated significantly through a POL. **Madison** sought to convert Reliable for this purpose.

p.      **Madison** knew, and explained to **Kurian** and **Phillips**, that many of the referring physicians to Unified and Spectrum were seeking additional sources of revenue (such as a POL) and it was essential to **Madison**'s business that these physicians remained happy customers. Reliable was attractive to **Madison** because it was already operational and had already received its license to operate. **Kurian** and **Phillips** agreed because they believed that Reliable would attract significantly more referrals under **Madison's** plan.

q.      All four defendants agreed that they would recruit physicians to join Reliable as owners based on prior or projected referral volume. Those with higher referral volume were considered more attractive potential owners to Reliable and those with lower volume were considered less attractive to Reliable. Other factors were not considered.

r.      The defendants analyzed referral volume as well to determine whether ownership shares (known as units) should be decreased or increased.

s.      In effect, the ownership units in Reliable constituted a payment to physicians in exchange for their referral of samples to Unified and Spectrum.

t.     On several occasions, Reliable made advance disbursement payments to physicians in an effort to appease that physician and ensure that the physician would not send samples to labs other than Unified, Spectrum, and Reliable.

### Overt Acts

40.     In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one coconspirator committed and caused to be committed, in the Northern District of Texas, and elsewhere, at least the following overt acts, among others:

a.     Lease Payments

1. In or about 2015 and 2016, Unified, at the direction of **Madison**, created and distributed a "Toxicology Training Manual" that specifically identified "lease rentals" as a "revenue stream" for physicians but that such "lease rentals" would only be offered to individuals who referred a minimum of 50 samples to Unified. In the same manual, Unified stated it could "employ a collector in the office upon physician request."

2. On or about November 24, 2015, **Madison** engaged in a series of communications with a marketer about lease payments for a certain medical provider. After a marketer requested expedited and retroactive payments as a result of competition, **Madison** authorized lease payments to the medical provider because **Madison** stated, "Go ahead and cut the checks today we don't want to take a chance and lose the account. Let's see if he can get the checks tomorrow."

3. On or about August 3, 2017, representatives from Unified, at the direction of **Madison**, offered to make certain lease agreements for certain physicians retroactive for the prior three months.

4. On or about August 7, 2015, **Madison** engaged in a series of communications with a marketer and authorized a lease payment to a medical provider based solely on the potential of volume referral.

5. In or about November 2015, Unified, at the direction of **Madison** and through **Boggess**, entered into a lease agreement with an individual identified here as Dr. B. The contract failed to list the lease amount, failed to identify a start date, or a termination date. Unified terminated the lease on or about October 6, 2017, after reviewing the number of samples submitted by Dr. B. and determining that the volume was too low.

6. On or about December 9, 2015, **Ortiz** sought to expedite the payment of lease checks to certain medical providers and explained that without these payments, the same medical providers would likely cease utilizing Unified. Within hours, **Madison** ordered that the checks be issued and sent the next day.

7. On or about December 16, 2016, **Madison** sent an email, which identified certain medical providers that were receiving either lease payments or salary offsets from Unified and Spectrum. Madison stated that his team was "considering to stop" these payments as they did not appear profitable with respect to those medical providers because their referral volume was too low.

8. Between December 2015 and April 2018, Unified and Spectrum made approximately 29 different lease payments to **Wichinski**, totaling over $25,000.

9. Between December 2015 and December 2018, Unified, Rojas, and entities controlled by Rojas made at least 36 different lease payments to **Maldonado**, totaling over $78,000.

10. Between September 2015 and February 2018, Unified and Rojas made approximately 40 different lease payments to an entity controlled by **Canova**, totaling over $51,000.

11. Referrals from a medical provider often increased significantly after Unified began making lease payments to a medical provider.

b.   Salary Offsets

1. In or about 2015, **Lizcano** and **Wichinski** agreed that **Wichinski** would send the vast majority of all blood and urine testing samples to Unified in exchange for (1) Unified paying half of the salary of each of **Wichinski's** three employees, (2) paying **Wichinski** a monthly lease payment of $850, and (3) paying the salary of new employee who would work in **Wichinski's** office on a full-time basis.

2. Unified made the agreed-to payments in each year between 2016 and 2018, totaling over $100,000 in salary offset payments.

3. In or about 2016 or 2017, Unified threatened **Wichinski** and **Lizcano** by telling them that if **Wichinski** didn't increase his volume, Unified would pull out of the current financial arrangements.   As a result, **Wichinski** increased the volume of referrals to Unified, averaging approximately 20-30 referrals a day to Unified.

4. Collectors, at the direction of **Madison**, utilized pre-sign requisition forms for certain diagnostic tests. As a result, certain tests were submitted without any review by an appropriate medical provider.

c. Payments to Third Parties

1. On May 4, 2017, **Lizcano** and **Ortiz** made a payment of $15,600 (check # 1289) to an individual identified here as D.W., who was the spouse of **Wichinski**, even though D.W. provided no medical services.

2. In May 2017, **Lizcano** and **Ortiz** created a spreadsheet containing false information regarding work allegedly performed by D.W. in an effort to account for the $15,600 payment.

3. On June 2, 2017, **Lizcano** and **Ortiz** made a payment of $15,099 (check # 1308) to an individual identified here as D.W., who was the spouse of **Wichinski**, even though D.W. provided no medical services.

4. In June 2017, **Lizcano** and **Ortiz** created a spreadsheet containing false information regarding work allegedly performed by D.W. in an effort to account for the $15,099 payment.

d. Medical Advisor Agreements

1. On or about January 1, 2017, **Rojas** and **Maldonado** entered into a Medical Advisor Agreement which stated that **Maldonado** would be paid for advisory services to Rojas & Associates, LLC.  **Maldonado** never performed these services but received over $44,000 in payments.

2. On or about February 1, 2016, **Rojas** and **Canova** entered into a Medical Advisor Agreement which stated that **Canova** would be paid for advisory services to Rojas & Associates, LLC.  **Canova** never performed these services but received over $260,000 in payments.

      3. **Rojas**, **Maldonado,** and **Canova** then created falsified invoices to make it appear as though **Maldonado** and **Canova** had, in fact, performed the agreed-to services and were being paid on an hourly rate for these services.

e.    Upcoding

      1. On or about June 25, 2015, **Madison** engaged in a series of communications with a marketer and encouraged the marketer to push medical providers to order "full panels," regardless of medical need. Full panels would generate greater revenue for Unified and Spectrum.

f.  Payments to Marketers

      1. In or about November 2017, **Madison** engaged in a series of communications with a marketer who was working for Unified and discussed the need for the creation of fake invoices to make it appear as though marketers were being paid on an hourly rate, as opposed to volume.

      2. In or about May 2016, among other months, Unified created fake invoices using a template, to make it appear as though marketers were being paid on an hourly rate, as opposed to volume.

      3. Between September 2015 and September 2017, entities controlled by **Madison** and **Boggess** made approximately 68 different payments to DCLH, controlled by **Lizcano** and **Ortiz**, totaling over $7.9 million.

g.  Ownership in Laboratory – Reliable

      1. In or about October and November 2015, **Madison**, **Kurian** and **Phillips** agreed to convert Reliable into a physician owned lab and **Madison** and **Boggess** purchased an ownership stake in Reliable.

      2. **Madison** and **Boggess** recommended specific physicians for inclusion in the ownership of Reliable based solely on their prior or potential for referrals.

      3. On certain occasions, including in or about April 2017, Reliable and a potential physician-owner agreed to an evaluation period, whereby the physician sent samples to Unified or Reliable for 60-90 days before he/she could buy ownership shares of Reliable.

4. Between 2016 and 2018, Reliable sold approximately 50 units in Reliable to approximately 24 physicians, including **Maldonado** and **Canova**. Only physicians who submitted samples were considered for ownership units in Reliable.

5. Many physician owners physically mailed their samples to Reliable, regardless of whether they were to be tested by Reliable or Spectrum or Unified.

6. On or about February 15, 2018, **Kurian** emailed a spreadsheet to other conspirators which tracked the number of samples sent to Unified and Reliable, by physicians who owned units in Reliable.

7. On or about March 7, 2018, **Kurian** emailed a spreadsheet to other conspirators which tracked the number of samples sent to Unified and Reliable, by physicians who owned units in Reliable. This spreadsheet included a column that indicated whether units for a specific physician should be increased and whether Reliable intended to seek redemption of units.

8. Every investor received far more in distributions than in the amount they invested. Some received over 35 times in distributions than the amount they invested. Distribution amounts were largely tied to volume referral.

9. On several occasions, **Kurian** and **Phillips** considered adjusting the amount of ownership of certain physicians based solely on the referral volume. They considered engaging in redemption agreements, the provision of new units, and the dilution of units to incentive greater referral volume.

10. In or about April 2016, the conspirators sought to illegally incentive a physician, known here as Dr. L, to submit referrals to Reliable. Given state restrictions in Dr. L's home state, Dr. L. could not become a member of Reliable, conspirators discussed funneling payments to Dr. L through other physicians. The conspirators ultimately agreed to incentivize Dr. L. though lease payments, even though no actual space was leased.

All done in violation of 18 U.S.C. § 371.

Counts Two through Thirteen
Offering or Payment of Illegal Kickbacks
(Violations of 42 U.S.C. §§ 1320a-7b(b)(2)(A) and 1320a-7b(b)(2)(B) and 18 U.S.C. § 2)

41.     The allegations contained in paragraphs 1 through 40 are realleged and fully incorporated herein.

42.     On or about the dates set forth below, in the Fort Division of the Northern District of Texas and elsewhere, the defendants identified below knowingly and willfully offered and paid remuneration, that is, kickbacks, directly and indirectly, overtly or covertly, in cash or in kind, to persons to induce those persons to refer for the furnishing or arranging for the furnishing of testing samples to Unified and Spectrum for blood and toxicology testing, or to induce another person to order or arrange for or recommend the ordering of an item or service for which payment could be made in whole or part under a federal health care program, namely Medicare, Tricare, and RRB, each kickback forming a separate count of this Indictment:

| Count | Date of Kickback | Amount of Kickback | Defendant(s) |
|---|---|---|---|
| 2 | March 6, 2017 | $ 850.00 | Madison, Boggess, Lizcano, Ortiz, |
| 3 | May 8, 2017 | $ 850.00 | Jeffrey Madison, Mark Boggess, David Lizcano, Laura Ortiz, |
| 4 | May 4, 2017 | $ 15,600.00 | Jeffrey Madison, Mark Boggess, David Lizcano, Laura Ortiz, |
| 5 | June 2, 2017 | $ 15,099.00 | Jeffrey Madison, Mark Boggess, David Lizcano, Laura Ortiz, |
| 6 | May 25, 2018 | $ 3,500.00 | Jeffrey Madison, Juan Rojas |
| 7 | September 30, 2018 | $ 2,750.00 | Jeffrey Madison, Juan Rojas |
| 8 | July 1, 2018 | $ 1,200.00 | Jeffrey Madison, Mark Boggess, Juan Rojas |
| 9 | August 25, 2018 | $ 4,800.00 | Jeffrey Madison, Mark Boggess, Juan Rojas |
| 10 | January 17, 2017 | $ 1,300.00 | Jeffrey Madison, Mark Boggess, Juan Rojas |
| 11 | December 27, 2016 | $ 1,300.00 | Jeffrey Madison, Mark Boggess, Juan Rojas |
| 12 | August 25, 2018 | $ 7,875.00 | Juan Rojas |
| 13 | November 1, 2018 | $ 7,875.00 | Juan Rojas |

In violation of 42 U.S.C. §§ 1320a-7b(b)(2)(A) and 1320a-7b(b)(2)(B) and 18 U.S.C. § 2.

Counts Fourteen through Twenty-Five
Soliciting and Receipt of Illegal Kickbacks
(Violations of 42 U.S.C. §§ 1320a-7b(b)(1)(A) and 1320a-7b(b)(1)(B) and 18 U.S.C. § 2)

43.     The allegations contained in paragraphs 1 through 42 are realleged and fully incorporated herein.

44.     On or about the dates set forth below, in the Fort Division of the Northern District of Texas and elsewhere, the defendants identified below, aided and abetted by others known and unknown to the Grand Jury, knowingly and willfully solicited or received remuneration, that is, kickbacks, directly and indirectly, overtly and covertly, in cash or in kind, in return for referring any individual for the furnishing or arranging for the furnishing or arranging of testing samples for blood and toxicology testing to Unified, Spectrum, or Reliable, or in return for ordering or recommending the ordering of any item or service for which payment could be made in whole or part under a federal health care program, namely Medicare, Tricare, and RRB, each kickback forming a separate count of this Indictment:

| Count | Date of Kickback | Amount of Kickback | Defendant(s) |
|---|---|---|---|
| 14 | March 6, 2017 | $      850.00 | Keith Wichinski, David Lizcano, Laura Ortiz |
| 15 | May 8, 2017 | $      850.00 | Keith Wichinski, David Lizcano, Laura Ortiz |
| 16 | May 4, 2017 | $ 15,600.00 | Keith Wichinski, David Lizcano, Laura Ortiz |
| 17 | June 2, 2017 | $ 15,099.00 | Keith Wichinski, David Lizcano, Laura Ortiz |
| 18 | May 25, 2018 | $   3,500.00 | Dr. Jose Roel Maldonado, Juan Rojas |
| 19 | September 30, 2018 | $   2,750.00 | Dr. Jose Roel Maldonado, Juan Rojas |
| 20 | July 1, 2018 | $   1,200.00 | Dr. Jose Roel Maldonado, Juan Rojas |
| 21 | August 25, 2018 | $   4,800.00 | Dr. Jose Roel Maldonado, Juan Rojas |
| 22 | January 17, 2017 | $   1,300.00 | Dr. Eduardo Carlos Canova, Juan Rojas |
| 23 | December 27, 2016 | $   1,300.00 | Dr. Eduardo Carlos Canova, Juan Rojas |
| 24 | August 25, 2018 | $   7,875.00 | Dr. Eduardo Carlos Canova |
| 25 | November 1, 2018 | $   7,875.00 | Dr. Eduardo Carlos Canova |

All in violation of 42 U.S.C. §§ 1320a-7b(b)(1)(A) and 1320a-7b(b)(1)(B) and 18 U.S.C. § 2.

<u>Count Twenty-Six</u>
Conspiracy to Commit Healthcare Fraud
(Violations of 18 U.S.C. § 1349)

45.     The allegations contained in paragraphs 1 through 44 are realleged and fully incorporated herein.

46.     Between in or around 2015 and continuing through in or around 2018, in the Fort Worth Division of the Northern District of Texas and elsewhere, the defendants, **Jeffrey Paul Madison**, **David Michael Lizcano**, **Laura Ortiz**, **Juan David Rojas**, **Keith Allen Wichinski**, **Dr. Jose Roel Maldonado,** and **Dr. Eduardo Carlos Canova** did knowingly and willfully combine, conspire, confederate, and agree with each other and with others, known and unknown to the Grand Jury, to violate 18 U.S.C. § 1347, that is to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in 18 U.S.C. § 24(b), that is Medicare, Tricare, and RRB, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of said healthcare benefit program, in connection with the delivery of and payment for healthcare benefits, items, and services.

**Purpose of the Conspiracy**

47.     It was the purpose of the conspiracy for the defendants to unlawfully enrich themselves by, among other things, (a) submitting requisitions for unnecessary toxicology tests, (b) billing Medicare, Tricare, and RRB for these unnecessary tests, (c) obtaining reimbursement form Medicare. Tricare, and RRB, and (d) paying kickbacks, as discussed above, in an effort convince medical providers to continue to order unnecessary tests.

### Manner and Means of the Conspiracy

48.     Medical providers, such as **Wichinski**, saw patients during regular intervals for wellness checks, sick visits, or pain management.  During the medical appointments, these medical providers often prescribed a drug test.  These tests were typically performed through an examination of the urine of a patient.

49.     The need for these tests might be to ensure (1) that the medical provider did not prescribe certain medication to an individual that was improperly using controlled substances; (2) to ensure that the medical provider did not prescribe a medication that the patient was already using, or (3) that the patient was using prescribed medication as directed.

50.     When ordering such a test, medical providers had the option of ordering (1) a screening/presumptive test, or (2) a confirmation test.  A screening/presumptive test could often be completed within a day or two and was less sophisticated.  A confirmation test took several days and was more sophisticated, and as a result, more expensive.

51.     A presumptive test did not provide a medical provider with any information that the confirmation test did not provide.

52.     Per guidance from Medicare and private insurance carriers, a medical provider was not to order both a screening/presumptive test and a confirmation test at the same time.  If a medical provider ordered a screening/presumptive test, then a confirmation test was only necessary if the results from the screening/presumptive tests were inconclusive, incomplete, or inconsistent with other observations made by the medical provider.

53. Alternatively, a medical provider, if they deemed it necessary and appropriate, could simply order the confirmation test and rely on those results, eliminating the need for the screening/presumptive test altogether.

54. In this case, however, marketers, including **Lizcano**, **Ortiz**, and **Rojas**, convinced medical providers, including **Wichinski**, **Maldonado**, and **Canova** to order both a screening/presumptive test and a confirmation test for a particular patient at the same time and regardless of other observations or results.

55. In addition, these same medical providers, including **Wichinski**, **Maldonado**, and **Canova**, would prescribe medication before receiving the results of either test.

56. These tests were submitted to Unified and Spectrum for analysis. Unified and Spectrum were able to bill Medicare, Tricare, and RRB significantly more than they otherwise could have if medical providers have been following the guidance with regards to use of screening/presumptive, and confirmation testing.

57. In exchange, marketers, working at the direction and in coordination with **Madison**, provided these same medical providers with kickbacks as discussed elsewhere in this indictment.

All done in violation of 18 U.S.C. § 1349.

## Forfeiture Allegation
(18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(7), and 28 U.S.C. § 2461(c))

58.     The allegations contained in the Introduction and Counts One through Twenty-Six of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures to the United States of America of certain property in which the defendants have an interest.

59.     Upon conviction of any violation of 18 U.S.C. § 371, the defendants, **Jeffrey Paul Madison**, **Mark Christopher Boggess**, **Biby Ancy Kurian**, **Abraham Phillips**, **David Michael Lizcano**, **Laura Ortiz**, **Juan David Rojas**, **Keith Allen Wichinski, Dr. Jose Roel Maldonado,** and **Dr. Eduardo Carlos Canova** shall forfeit to the United States any property, real or personal, that constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity," pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

60.     Upon conviction of any Federal health care offense, the defendants, **Jeffrey Paul Madison**, **Mark Christopher Boggess**, **Biby Ancy Kurian**, **Abraham Phillips**, **David Michael Lizcano**, **Laura Ortiz**, **Juan David Rojas**, **Keith Allen Wichinski, Dr. Jose Roel Maldonado,** and **Dr. Eduardo Carlos Canova** shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to 18 U.S.C. § 982(a)(7).

61.     Pursuant to 21 U.S.C. § 853(p), as incorporated by reference by 18 U.S.C. § 982(b), if any of the forfeitable property, or any portion thereof, as a result of any act or omission of the defendant:

     a.  cannot be located upon the exercise of due diligence;

     b.  has been transferred, or sold to, or deposited with a third party;

     c.  has been placed beyond the jurisdiction of the Court;

     d.  has been substantially diminished in value; or

     e.  has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek the forfeiture of other property of the defendant up to the value of the above-described forfeitable properties, including, but not limited to, any identifiable property in the names of the defendants, **Jeffrey Paul Madison**, **Mark Christopher Boggess**, **Biby Ancy Kurian**, **Abraham Phillips**, **David Michael Lizcano**, **Laura Ortiz**, **Juan David Rojas**, **Keith Allen Wichinski, Dr. Jose Roel Maldonado,** and **Dr. Eduardo Carlos Canova.**

62.     By virtue of the commission of the offense alleged in this Indictment, any and all interest the defendants have in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(7), and 28 U.S.C. § 2461(c).

63.    All pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)97), and 28 U.S.C. § 2461(c) and the procedures set forth at 21 U.S.C. § 853, as made applicable through 18 U.S.C § 982(b)(1).

A TRUE BILL.

_____
FOREPERSON

CHAD MEACHAM
UNITED STATES ATTORNEY

_____
P.J. MEITL
Assistant United States Attorney
District of Columbia Bar No. 502391
Virginia Bar No. 73215
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8680
Facsimile: 214-659-8812
Email: philip.meitl@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

THE UNITED STATES OF AMERICA

v.

JEFFREY PAUL MADISON (01)
MARK CHRISTOPHER BOGGESS (02)
BIBY ANCY KURIAN (03)
ABRAHAM PHILLIPS (04)
DAVID MICHAEL LIZANO (05)
LAURA ORTIZ (06)
KEITH ALLEN WICHINSKI (07)
JUAN DAVID ROJAS (08)
DR. JOSE ROEL MALDONADO (09)
DR. EDUARDO CARLOS CANOVA (10)

INDICTMENT

18 U.S.C. § 371
Conspiracy to Pay and Receive Health Care Kickbacks
Count 1

42 U.S.C. §§ 1320a-7b(b)(2)(A) and 1320a-7b(b)(2)(B) and 18 U.S.C. § 2
Offering or Payment of Illegal Kickbacks
Counts 2-13

42 U.S.C. §§ 1320a-7b(b)(1)(A) and 1320a-7b(b)(2)(B) and 18 U.S.C. § 2
Soliciting and Receipt of Illegal Kickback
Counts 14-25

18 U.S.C. § 1349
Conspiracy to Commit Healthcare Fraud
Counts 26

18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(7), and 28 U.S.C. § 2461(c)
FORFEITURE

---

A true bill rendered

--------------------------------------------------------------

FORT WORTH                                                    FOREPERSON

Filed in open court this 9th day of February, 2022.

--------------------------------------------------------------

---

**Summons to Issue – Defendants (01), (02), (03), (04), (06), (07), (08), (09), (10).**
**Warrant to Issue – (05)**

--------------------------------------------------------------

UNITED STATES MAGISTRATE JUDGE
No Criminal Matter Pending